# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 21-2956

———————————————

White Knight Diner, LLC; Larry Lee Hinds; Karen Freiner

*Plaintiffs - Appellants*

v.

Owners Insurance Company

*Defendant - Appellee*

——————————

Appeal from United States District Court
for the Eastern District of Missouri – St. Louis

——————————

Submitted: September 21, 2022
Filed: June 6, 2023

——————————

Before SMITH, Chief Judge, KELLY and GRASZ, Circuit Judges.

——————————

KELLY, Circuit Judge.

White Knight Diner, LLC, Larry Lee Hinds, and Karen Freiner (collectively, White Knight) appeal the decision of the district court[1] to grant summary judgment

—————————————

[1]The Honorable Matthew T. Schelp, United States District Judge for the Eastern District of Missouri.

in favor of Owners Insurance Company (Owners). Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

On March 15, 2015, Ambar Arango and Dzemal Omervic were involved in a car accident in St. Louis, Missouri. One of the cars crashed into White Knight Diner, resulting in property damage to the restaurant. At the time, White Knight was insured by Owners pursuant to a policy that provided coverage for property damage and loss of business income (the Policy). The Policy included the following subrogation[2] clause:

> If any person or organization to or from whom we make payment under this Coverage Part has rights to recover damages from another, those rights are transferred to us to the extent of our payment. That person or organization must do everything necessary to secure our rights and must do nothing after loss to impair them. But you may waive your right against another party in writing[.]

The Policy was also subject to a $1,000 deductible.

Following the accident, White Knight submitted a claim to Owners pursuant to the Policy, and Owners paid White Knight $66,366.27. That amount represented $49,965.10 for property damage and $16,371.17 for loss of business income. The repairs for White Knight's property damage were completed by October 2015.

White Knight subsequently brought suit in Missouri state court against Arango and Omervic for lost income (the Arango Litigation). Arango was insured by State Farm, and Omervic was insured by Progressive. Both drivers were subject

---

[2]In the insurance context, subrogation is the "principle under which an insurer that has paid a loss under an insurance policy is entitled to all the rights and remedies belonging to the insured against a third party with respect to any loss covered by the policy." Subrogation, Black's Law Dictionary (11th ed. 2019).

to policy limits for liability coverage: Arango's State Farm policy limit was $50,000, and Omervic's Progressive policy limit was $25,000.

Before White Knight initiated the Arango Litigation, Owners sought to recoup from State Farm and Progressive the money it had paid to White Knight under the Policy, as well as White Knight's $1,000 deductible. Specifically, on July 15, 2015, Owners[3] sent State Farm a "Request for Payment" with instructions to "CONTACT [OWNERS] PRIOR TO SETTLEMENT." On December 8, 2015, State Farm issued a check to Owners in the amount of $33,668.14, which represented half of the money Owners had paid to White Knight plus half of White Knight's $1,000 deductible. Owners then issued a $500 check to White Knight. State Farm did not require a full release of White Knight's claims or future claims in exchange for its payment to Owners.

Owners also sent a near-identical request to Progressive but, unlike State Farm, Progressive declined to pay. Owners told White Knight, which was aware of the Policy's subrogation clause, about its efforts to recoup its payment to White Knight from the drivers' insurers. White Knight did not object.

After Arango's insurer paid Owners, Arango sought a setoff for that amount in the still-ongoing Arango Litigation. The state court denied that request, concluding that Arango could not assert a setoff against any amount she owed White Knight for sums State Farm paid to Owners. White Knight eventually settled its claim against Omervic for $25,000, and settled its claim against Arango for $16,331.86. The state court then dismissed White Knight's case with prejudice.

While the Arango Litigation was still pending, White Knight and several other insureds filed the instant class action against various insurance companies including Owners. The plaintiffs sought, among other things, an order declaring that these

---

[3]Owners hired Trover Solutions "to handle [its] subrogation portion," but we refer to Owners for simplicity.

insurers' practice of settling subrogation claims with each other directly, without the insureds' involvement, violated Missouri subrogation law.[4]  After the insurers brought several motions to dismiss, the district court dismissed all parties except for Owners and White Knight.  White Knight then filed an amended complaint against Owners only, adding new causes of action, including breach of contract and breach of the implied covenant of good faith and fair dealing.

Owners filed a motion for summary judgment on all claims.  White Knight moved for partial summary judgment on its declaratory judgment claim.  The district court granted Owners's motion, denied White Knight's motion, and entered judgment in Owners's favor.  White Knight now appeals.

II.

On appeal, White Knight argues that because Owners's conduct violated Missouri subrogation law, the district court erred in granting summary judgment to Owners on its declaratory judgment claim.  In addition, White Knight argues there were disputed questions of material fact concerning whether Owners's actions were taken in violation of the Policy and thus a reasonable jury could find in White Knight's favor on its breach of contract and implied covenant of good faith and fair dealing claims.

We review the grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor. Langford v. Norris, 614 F.3d 445, 459 (8th Cir. 2010).  "Missouri law controls as to all substantive matters in this case," including interpretation of the Policy. Travelers Prop. Cas. Ins. Co. of Am. v. Nat'l Union Ins. Co. of Pittsburgh, 621 F.3d 697, 707 (8th Cir. 2010).

---

[4]The class action was initially filed in Missouri state court, but it was subsequently removed to federal court by one of the defendant-insurers.

## A.

First, White Knight contends it was entitled to an order declaring that Owners violated Missouri law when it sought subrogation-related reimbursement from State Farm and Progressive before White Knight recovered any money from the drivers responsible for its damages.

Generally, in Missouri, if an insurance company "under its contract obligation pays all or part of the property damage incurred by its insured[,]" that insurance company is subrogated to the insured's rights against the third party that caused the damage. See Farmers Ins. Co. v. Effertz, 795 S.W.2d 424, 426 (Mo. Ct. App. 1990); see also Kroeker v. State Farm Mut. Auto. Ins. Co., 466 S.W.2d 105, 111 (Mo. Ct. App. 1971). "Unlike some states, which provide that legal title to a property damage claim passes to [an] injured party's insurer once the insurer pays the injured party's claim, Missouri provides that the legal title to the cause of action remains in the insured, and that the insurer's only interest is an equitable right to subrogation." Hagar v. Wright Tire & Appliance, Inc., 33 S.W.3d 605, 610 (Mo. Ct. App. 2000). Thus the "exclusive right to sue for the entire loss remains with the insured, though he will hold the proceeds for the insurer." Effertz, 795 S.W.2d at 426. This means that absent an assignment[5] of claims from the insured, an insurance company may not sue or formally settle with the tortfeasor or the tortfeasor's insurer directly. See Hagar, 33 S.W.3d at 610–11 ("In a subrogation situation, since the insured still holds the legal right to the claim, the insurer cannot sue the tortfeasor directly but must wait and assert its subrogation interest against any recovery the insured makes against the tortfeasor," and since the insurer has "no right to prosecute [a] claim directly, it certainly ha[s] no right to arbitrate and settle the claim directly, without the [insured's] consent.").

---

[5]See Keisker v. Farmer, 90 S.W.3d 71, 74 (Mo. banc 2002) (explaining the distinction between an assignment and subrogation in that with an assignment, "the assignor gives all rights to the assignee[,]" and in the insurance context, "[b]y an assignment, the insurer receives legal title to the claim, and the exclusive right to pursue the tortfeasor").

Against this backdrop, White Knight asserts that Owners's efforts to obtain reimbursement directly from State Farm and Progressive, before White Knight had recovered anything from the tortfeasors, "violated Missouri subrogation law." In support, White Knight relies on Hagar. In Hagar, Shelter Insurance paid its insured, the Hagars, for property damage after a fire at their home, and the Hagars then sued Wright Tire, the alleged third-party tortfeasor, for personal injury and property damage. 33 S.W.3d at 607–08. Shelter then approached Wright Tire's insurer, Continental, for reimbursement of its payment to the Hagars. And in exchange for a release of liability, Continental ultimately reimbursed and settled with Shelter. Id. at 608–09. When the suit between the Hagars and Wright Tire was resolved, Wright Tire sought a credit against the judgment for the amount its insurer, Continental, had already paid to Shelter. Id. at 609. The trial court refused to allow the credit. Id.

The Missouri Court of Appeals affirmed. The court determined that because Shelter only held a subrogation interest in the claim, "Shelter had no right to prosecute any portion of the Hagars's claim against Continental or Wright Tire directly." Hagar, 33 S.W.3d at 611. With no right to prosecute the claim, it necessarily followed that Shelter "had no right to arbitrate and settle the claim directly, without the Hagars's consent." Id. Wright Tire was therefore properly denied a credit against the judgment for the amount its insurer had paid Shelter. Id. at 607, 610–12. Accordingly, after Hagar, a court in Missouri will not recognize as valid an insurer's premature effort to recover money from a tortfeasor, under the guise of subrogation, that it paid its injured insured.

But a refusal to recognize a premature payment as valid subrogation is not the same as saying those premature efforts are illegal. Here Owners sought—and partially obtained—payment from the drivers' insurers, even though Owners had no legal right to the claim against either driver. But the state court in the Arango Litigation recognized this. Citing Hagar, the court denied Arango's request for a credit against the judgment for the money State Farm—Arango's insurer—had already paid Owners. See Hagar, 33 S.W.3d at 609–12. White Knight calls out Owners for trying to circumvent the subrogation clause in the Policy. In Hagar the

-6-

court addressed almost identical circumstances and agreed that the insurance companies' premature settlement and reimbursement efforts were not enforceable as a matter of law. But the court did not declare the conduct unlawful. Until Missouri courts or the Missouri legislature makes such a declaration, we decline White Knight's invitation to do so ourselves.

B.

The more difficult question is whether Owners breached the Policy when it sought reimbursement from the tortfeasors' insurers in a manner contrary to the subrogation rights granted in the Policy. To state a claim for breach of contract under Missouri law, a party must allege "(1) the making and existence of a valid and enforceable contract, (2) the right of the plaintiff and the obligation of the defendant thereunder, (3) a violation thereof by the defendant, and (4) damages resulting to the plaintiff from the breach." Compass Bank v. Eager Rd. Assocs., LLC, 922 F. Supp. 2d 818, 823 (E.D. Mo. 2013) (citing Gilomen v. Sw. Mo. Truck Ctr., Inc., 737 S.W.2d 499, 500–01 (Mo. Ct. App. 1987)).

White Knight argues that disputed material facts remain as to whether Owners's subrogation efforts—or attempted subrogation efforts—were conducted in breach of the Policy. But the Policy does not expressly prohibit Owners from requesting payment from the tortfeasors' insurers. And to the extent White Knight argues that Owners breached its contract because its reimbursement request to State Farm violated Missouri law, this argument is unavailing as we have explained above.

Nonetheless, even assuming Owners's actions were taken pursuant to the Policy, White Knight's claim still fails because it does not establish that it suffered any damages as a result of Owners's failure to abide by the contracted-for procedures. White Knight, as an insured party under the Policy, contracted for and paid premiums to receive insurance. And Owners settled White Knight's claim under the Policy when Owners paid White Knight a total of $66,366.27 for property damage and business income loss. On appeal, White Knight does not argue that

Owners's payment under the Policy was insufficient to compensate it for its covered losses, nor does White Knight contend that it made additional requests for compensation or that such requests were denied by Owners.[6] To the contrary, by not spending all of the money it received from Owners, White Knight implicitly conceded that additional funds were unnecessary for its claimed property repairs. In short, White Knight does not point the court to evidence of additional covered loss amounts that Owners failed to pay under the Policy. Thus, White Knight has not shown that it suffered any damages beyond the compensation it received from Owners. Without evidence of damages, a breach of contract claim fails. See Al-Khaldiya Elecs. & Elec. Equip. Co. v. Boeing Co., 571 F.3d 754, 759 (8th Cir. 2009) ("Summary judgment is appropriate where there is no evidence that the plaintiff was damaged by a breach of contract.").

White Knight also maintains that its ability to recover its uninsured losses from Arango was compromised. That is, White Knight contends that it was forced to settle its lost income claim against Arango for less than State Farm's policy limit because State Farm had already paid Owners $33,668.14. But, as White Knight acknowledges, Arango was not entitled to a setoff based on State Farm's payment to Owners. And nothing prevented White Knight from recovering the full policy amount in its claim against Arango. Moreover, White Knight would have only been able to keep what it recovered in the Arango Litigation to the extent it could prove uninsured damages or damages in excess of what Owners paid it under the Policy. See Keisker, 90 S.W.3d at 75 (holding that an insured could keep lost profits to the extent it could prove that these profits represented uninsured losses); Travelers Prop. Cas. Co. of Am. v. Kansas City Power & Light, 568 F. Supp. 2d 1040, 1060–61 (W.D. Mo. 2008) (holding that an insured was entitled to keep excess recovery to the extent it represented provable uninsured losses). To the extent White Knight now suggests it had identifiable uninsured losses, White Knight fails to offer any evidence—or point to anything in the record—demonstrating any uninsured losses.

---

[6]As the district court determined, White Knight did not bring a claim challenging Owners's investigation, valuation, or payment of its insurance claim.

See, e.g., Extended Stay Inc. v. Am. Auto. Ins. Co., 375 S.W.3d 834, 843 (Mo. Ct. App. 2012) ("Although it is not always possible to establish the amount of damages with the same degree of certainty, a claimant must establish *the fact* of damages with reasonable certainty.").[7]

C.

Finally, White Knight argues that Owners violated its duty of good faith and fair dealing when it asked State Farm for its pro rata share of the damages paid to White Knight under the Policy. "Missouri law implies a covenant of good faith and fair dealing in every contract." Farmers' Elec. Coop., Inc. v. Mo. Dep't of Corr., 977 S.W.2d 266, 271 (Mo. banc 1998). Under Missouri law, a "breach of the covenant of good faith and fair dealing occurs where one party exercises a judgment conferred by the express terms of the agreement in such a manner as to evade the spirit of the transaction or so as to deny the other party the expected benefit of the contract." Cordry v. Vanderbilt Mortg. & Fin., Inc., 445 F.3d 1106, 1112 (8th Cir. 2006) (cleaned up) (quoting Mo. Consol. Health Care Plan v. Cmty. Health Plan, 81 S.W.3d 34, 46 (Mo. Ct. App. 2002)).

White Knight argues that because there are disputed issues of fact as to whether Owners breached the Policy, a jury could find that Owners violated its duty of good faith and fair dealing when it exercised its subrogation rights in a manner that disadvantaged White Knight and deprived it of the benefits of the subrogation

---

[7]White Knight also appears to contend that it was damaged because, had Owners waited to assert its subrogation rights until White Knight recovered from Arango and Omervic, White Knight would have insisted Owners share the expenses and fees incurred in suing the drivers. See Keisker, 90 S.W.3d at 75 (explaining that an insurer's "subrogation recovery must be reduced by its share of litigation expenses"). But White Knight never asked Owners to share expenses, even after receiving notification of Owners's prejudgment efforts to seek reimbursement from the drivers' insurers. And in any event, the summary judgment record lacks evidence to support any amount White Knight asserts it would be owed, leaving a finder of fact with no evidence of loss.

clause. Because the breach of contract claim fails, this claim necessarily fails as well. See Koger v. Hartford Life Ins. Co., 28 S.W.3d 405, 413 (Mo. Ct. App. 2000) (holding that the trial court did not err in granting summary judgment in the insurer's favor on the insured's good faith and fair dealing claim because insured did not suffer damages).[8]

## III.

We affirm the judgment of the district court.

_____

---

[8]To the extent White Knight argues Owners's conduct violated the spirit of the Policy, see Glenn v. HealthLink HMO, Inc., 360 S.W.3d 866, 877 (Mo. Ct. App. 2012) (noting that a party exercising express contract rights may still breach the covenant of good faith if it does so "in a manner that evades the spirit of the agreement and denies the movant the expected benefit of the agreement"), White Knight overlooks the nature of subrogation. The purpose of subrogation is to, among other things, place the loss on the wrongdoer and to prevent the insured from receiving a double recovery for a single loss. See Keisker, 90 S.W.3d at 75 ("Subrogation exists to prevent unjust enrichment."). Subrogation thus provides an equitable allocation of payment responsibility. With these principles in mind, White Knight has failed to show that it was disadvantaged or otherwise deprived of the benefits of the Policy's subrogation clause under the facts of this case.